Slip Op. 20-149

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CANADIAN SOLAR INC., *ET AL.* | |
| Plaintiffs, | |
| SUMEC HARDWARE & TOOLS CO., LTD., | |
| Consolidated Plaintiff, and | Before: Jane A. Restani, Judge |
| CHANGZHOU TRINA SOLAR ENERGY CO., LTD. *ET AL.*, | Consol. Court No. 18-00184 |
| Consolidated Plaintiffs, | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| SOLARWORLD AMERICAS, INC., | |
| Defendant-Intervenors. | |

## OPINION

Dated: October 19, 2020

[Commerce's Remand Results in the Fourth Administrative Review of the countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules from the People's Republic of China are sustained]

Jeffrey S. Grimson, Bryan P. Cenko, James C. Beaty, Jill A. Cramer, Kristin H. Mowry, and Sarah M. Wyss, Mowry & Grimson, PLLC, of Washington D.C. for Plaintiffs, Canadian Solar Inc., Canadian Solar International, Ltd., Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu) Inc., CSI Cells Co., Ltd., CSI Solar Power (China) Inc., CSI Solartronics (Changshu) Co., Ltd., CSI Solar Technologies Inc., CSI Solar Manufacture Inc., CSI New Energy Holding Co., Ltd., CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd., Changshu Tegu New Materials Technology Co., Ltd., Changshu Tlian Co., Ltd., Suzhou Sanysolar Materials Technology Co., Ltd. and Canadian Solar (USA) Inc.

Mark B. Lehnardt and Lindita V. Ciko Torza, Baker & Hostetler, LLP, of Washington D.C.

for Consolidated Plaintiff Sumec Hardware & Tools Co., Ltd.

Robert A. Gosselink, Jarrod M. Goldfeder, and Jonathan M. Freed, and Kenneth N. Hammer, Trade Pacific, PLLC, of Washington, D.C., for Consolidated Plaintiffs Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Yancheng Trina Solar Energy Technology Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., and Changzhou Trina PV Ribbon Materials Co., Ltd.

Jeffrey B. Clark, Jeanne E. Davidson, Tara K. Hogan, and Justin R. Miller, International Trade Field Office, U.S. Department of Justice, of New York, NY for the Defendant. Of counsel on the brief was Paul K. Keith, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Timothy C. Brightbill, Adam M. Teslik, Cynthia C. Galvez, Douglas C. Dreier, Enbar Toledano, John A. Riggins, Laura El-Sabaawi, Maureen E. Thorson, Stephanie M. Bell, and Stephen J. Obermeier, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor SolarWorld Americas, Inc.

Restani, Judge: This action concerns the remand redetermination made by the United States Department of Commerce ("Commerce") in the Fourth Administrative Review of the countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules from the People's Republic of China ("PRC") covering the period of review from January 1, 2015 to December 31, 2015.

Plaintiffs and Consolidated Plaintiffs Canadian Solar Inc., Canadian Solar International, Ltd., Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu) Inc., CSI Cells Co., Ltd., CSI Solar Power (China) Inc., CSI Solartronics (Changshu) Co., Ltd., CSI Solar Technologies Inc., CSI Solar Manufacture Inc., CSI New Energy Holding Co., Ltd., CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd., Changshu Tegu New Materials Technology Co., Ltd., Changshu Tlian Co., Ltd., Suzhou Sanysolar Materials Technology Co., Ltd., and Canadian Solar (USA) Inc. (collectively, "Canadian Solar") and Sumec Hardware & Tools Co.,

Ltd. ("Sumec");[1] challenge Commerce's findings that the provision of aluminum extrusions and electricity are countervailable subsidies and Commerce's refusal to accept Canadian Solar's import data in setting the benchmark for polysilicon. See Comments on Final Remand Redetermination of Canadian Solar at 3–29 ECF No. 102 (Aug. 11, 2020) ("Canadian Solar Br.").

Largely relying on arguments made before the court prior to remand and at the agency level, Defendant-Intervenor SolarWorld Americas, Inc. ("SolarWorld") challenges Commerce's finding that the respondents did not benefit from the Export Buyer's Credit Program and contests Commerce's revised benchmark for aluminum extrusions. See SolarWorld's Objection to Remand Redetermination at 1–4, ECF No. 101 (Aug. 11, 2020) ("SolarWorld Br."). Consolidated Plaintiffs Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Yancheng Trina Solar Energy Technology Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., and Changzhou Trina PV Ribbon Materials Co., Ltd. (collectively, "Trina") argue that Commerce's determinations that respondents did not benefit from the EBCP and the revision of the benchmark for aluminum frames are supported by substantial evidence. See Response of Trina to Cmts. On Remand Redetermination, at 3–5 ECF No. 111 (Sep. 10, 2020) ("Trina Resp.").

## BACKGROUND

The court presumes familiarity with the facts of this case and recounts them only as necessary. Commerce issued its final results in the Fourth Administrative Review of the countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules from the PRC on July 23, 2018. Crystalline Silicon Photovoltaic Cells, Whether or Not

---

[1] Sumec submitted comments adopting and incorporating by reference Canadian Solar's comments, but did not submit its own arguments. See Comments on Final Remand Redetermination of Sumec Hardware & Tools Co., Ltd., ECF No. 104 (Aug. 11, 2020).

Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015, 83 Fed. Reg. 34,828 (Dep't Commerce July 23, 2018), as amended by Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Results of Countervailing Duty Administrative Review; 2015, 83 Fed. Reg. 54,566 (Dep't Commerce Oct. 30, 2018) ("Amended Final Results"). In Canadian Solar Inc. v. United States, the court remanded in part and sustained in part Commerce's determination. Slip Op. 20-23, 2020 WL 898557 (CIT Feb. 25, 2020) ("Canadian Solar I"). On remand, Commerce has further addressed: (1) whether respondents benefited from the Export Buyer's Credit Program ("EBCP"), (2) whether the provision of aluminum extrusions is a specific subsidy, (3) which datasets to use in setting a benchmark for aluminum extrusions, (4) whether the provision of electricity is a specific subsidy, (5) whether Commerce should accept Canadian Solar's import pricing data in setting a benchmark for polysilicon, (6) whether Commerce should use data from Xeneta in determining ocean freight expenses, and (7) whether Commerce should revise its electricity pricing calculations in view of a purported translation error. See Final Results of Redetermination Pursuant to Court Remand at 6–31, ECF No. 95-1 (June 26, 2020) ("Remand Results").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012). The court will sustain Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i). Further, remand redeterminations are "also reviewed for compliance with the court's remand order." Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States, 968 F. Supp. 2d 1255 (CIT 2014) (citation and quotation marks omitted).

# DISCUSSION

## I. Export Buyer's Credit Program

In its original determination, Commerce rejected respondents' certifications of non-use after determining that the claims of non-use were unverifiable in the light of the GOC's failure to provide details on the operation of the EBCP. See Decision Memorandum for Final Results of Countervailing Duty Administrative Review: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; 2015, C-570-980, at 7–8 (Dep't Commerce July 12, 2018) ("I & D Memo"). Following a request from Commerce, the court remanded for reconsideration the agency's determination that respondents benefitted from the EBCP and instructed Commerce to review recent opinions addressing use of the EBCP. See Canadian Solar I at *2 (citing Changzhou Trina Solar Energy Co.,Ltd. v. United States, 352 F. Supp. 3d 1316 (CIT 2018) ("Changzhou Trina I") and Changzhou Trina Solar Energy Co., Ltd. v. United States, Slip Op. 19-137, 2019 WL 5856438 (CIT Nov. 8, 2019) ("Changzhou Trina II"). On remand, Commerce maintains that without a full understanding of the operation of the EBCP, it is unable to verify respondents' claims of non-use. Remand Results at 6–7. Nevertheless, given recent court decisions on the matter, Commerce has found "the program not used in this instance." Id. at 8. Canadian Solar argues that Commerce's finding that respondents' non-use certifications were unverifiable is unreasonable, although it supports Commerce's ultimate determination. Canadian Solar Br. at 2. SolarWorld incorporates by reference its previous arguments that without the Government of the PRC's ("GOC") cooperation, the claims of non-use are unverifiable. SolarWorld Br. at 1–3. Trina responds that Commerce's decision to accept respondents' uncontroverted claims of non-use of the EBCP complies with the court's remand by not unnecessarily punishing cooperating parties for the GOC's noncooperation. Trina Resp. at 3–5.

As with recent cases involving the EBCP, Commerce maintains that without full knowledge of the program, nothing respondents could offer would suffice to verify their claims of non-use. See Changzhou Trina Solar Energy Co., Ltd. v. United States, at *3–4, Slip Op. 20-108, 2020 WL 4464258 (CIT 2020) ("Changzhou Trina III"); see also Jiangsu Zhongji Lamination Materials Co. v. United States, at *3 Slip Op. 20-39, 2020 WL 1456531 (CIT 2020) ("Jiangsu"). Although the court has suggested potential ways forward, see Changzhou Trina II, at *4, Commerce remains steadfast in its determination and instead has reverted to accepting the claims of non-use as it has done in previous administrative reviews. See Remand Results at 6–8; Changzhou Trina III, at *4.

No party submits any new evidence or argument that would allow the court to sanction Commerce's position that the certifications are, as Commerce claims, unverifiable. The certifications of non-use of the EBCP are uncontroverted and it is not impermissible for Commerce to accept these at this juncture. Accordingly, for the reasons stated in the court's previous opinions on the matter, see Changzhou Trina III, at *3–4; Jiangsu, at *3, the court holds that accepting respondents' certifications of non-use in this situation is permissible and sustains Commerce's determination.

II.   **Specificity of Aluminum Extrusions**

Commerce originally found that the provision of aluminum extrusions was a de facto specific subsidy because the users were limited in number, thus rendering the subsidy countervailable. I & D Memo at 30. The government requested remand to reconsider its affirmative aluminum extrusions specificity determination in view of the court's opinions in Changzhou Trina I and Changzhou Trina II, which addressed nearly the same issue. See Canadian Solar I, at *2. The court remanded on this issue and instructed Commerce to consult these prior opinions. Id.

On remand, Commerce continues to find that the subsidy is de facto specific because it is limited to few users within six broad sectors of the Chinese economy. See Remand Results at 9–13. It found use of aluminum extrusions was limited to specific applications such as "frames of doors and windows," "curtain wall," "structural frames," "bridges," "guard bars," "elevator and escalator," "shield, handrail and terrace," "agricultural machinery," "radiator," and "shape-setting equipment and assembly-line equipment." Id. at 11. Accordingly, Commerce continued to find that the subsidy was de facto specific. Id. at 12–13; see also 19 U.S.C. § 1677(5A)(D)(iii)(I).

Canadian Solar contends that the record since the previous administrative review has developed such that Commerce's decision is not supported by substantial evidence. Canadian Solar Br. at 3–10. It argues that Commerce cannot rely on information from the third administrative Review and that information provided by Canadian Solar and the GOC show that aluminum extrusions are used in numerous industries. Id. at 5–9. It further avers that the solar industry is not a predominate user of aluminum extrusions. Id. at 6.

The government responds that Commerce considered the new information by the GOC and Canadian Solar and found that it did not alter the agency's decision as the information still showed that aluminum extrusions were used in a narrow range of applications. See Gov. Reply at 11–13. The GOC's statements, it argues, are "general conclusions rather than evidence of how aluminum extrusions are used." Id. at 12–13. It further notes that Commerce's decision was not based on a finding that the solar industry was a disproportionate user of the subsidy, but based on the subsidy's use in a limited number of applications. Id. at 12.

Commerce relies in part on information submitted by the GOC in the third administrative review detailing the major uses of aluminum extrusions. See Placing Aluminum Consumption Information on the Record, Rem. P. R. 7 (Dep't Commerce Apr. 16, 2020). The court considered

this evidence in a case involving the third administrative review. See Changzhou Trina II, at *6. There, Commerce also determined that there was disproportionate usage in a narrow range of applications and thus found that the provision of aluminum extrusions was a specific subsidy. Id. The court held that Commerce's decision was supported by substantial evidence and sustained the specificity determination. Id. Canadian Solar argues that information offered by it and the GOC in this fourth administrative review requires a different outcome. Canadian Solar Br. at 6–8.

First, Canadian Solar cites more recent submissions from the GOC in the fourth, fifth, and sixth administrative reviews that each state that there are a "vast number of uses for aluminum extrusions" and that they are not disproportionately used by the solar industry. Id. at 6. Further, the GOC submission no longer contains the more detailed list of uses of aluminum extrusions that it provided in the previous review. Second, Canadian Solar cites a recent ITC Report on aluminum extrusions from China that it submitted to Commerce, which found that "aluminum extrusions are used in a wide variety of finished good applications" and lists several uses. See id. at 7-8; Canadian Solar's Letter Re: NFI on Aluminum Consumption, Rem. P.R. 13, at Ex. 4, I-10 (Apr. 29, 2020) ("ITC Report").

It was not unreasonable for Commerce to decide not to revise its determination in view of the GOC's recent, conclusory statements offered without sufficient supporting information. Although the court must consider all record evidence, including evidence that detracts from the agency's ultimate determination, see Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) conclusory statements without more are not evidence. Commerce considered the additional evidence submitted by Canadian Solar regarding end use applications, and found that although the uses listed in those documents expand upon the previous list of uses cited by Commerce, use was still limited to a narrow range of applications and thus a limited number of

actual users. See Remand Results at 11–12. Commerce's decision is not unreasonable. For example, although the ITC Report lists some additional "[m]ajor end-use applications," this list overlaps to some extent with Commerce's previous list of applications and, nonetheless, still appears narrow compared to the breadth of manufacturers in China. See ITC Report; see also Remand Results at 12 (listing the numerous types of manufacturers in China). Although the evidence provided by Canadian Solar lists additional uses for aluminum extrusions not previously noted, this does not render Commerce's decision that aluminum extrusions are predominately utilized by few users unsupported by substantial evidence. See Changzhou Trina II, at *6, *5 n.9. Accordingly, Commerce's specificity determination is sustained.

### III. Benchmark for Aluminum Extrusions

Commerce previously averaged UN Comtrade and IHS datasets in computing the aluminum extrusions benchmark. See I & D Memo at 30–31. Following a requested remand, and in view of the court's decision in Changzhou Trina I and Changzhou Trina II, Commerce has relied solely on the IHS data in computing the benchmark. See Remand Results at 13–14.

SolarWorld argues that Commerce should have continued to average the IHS and Comtrade datasets because the Harmonized Tariff Schedule subheadings relied on by the Comtrade data was sufficiently comparable to solar frames. See SolarWorld Br. at 3–4. Canadian Solar and Trina respond that Commerce is correct in relying on the IHS data alone given the lack of evidence demonstrating that the Comtrade data is sufficiently comparable to solar frames. See Canadian Solar Reply at 6–8; Trina Br. at 5. The government agrees, noting that Commerce was unable to "adequately address factors affecting comparability," thus rendering use of the IHS data alone the proper course of action. Gov. Br. at 13–14.

The court has previously faulted Commerce for failing to account for "factors affecting

comparability" as required by 19 C.F.R. § 351.511(a)(2)(ii) in choosing datasets to set its aluminum extrusions benchmark. See Changzhou Trina I, at 1331–33; Changzhou Trina II, at *6–7. Specifically, the court was concerned that the Comtrade data appeared to include data from products unrelated to solar frames, whereas the IHS data was specific to solar frames. Id. After considering these previous opinions, Commerce has relied solely on the IHS data in setting the benchmark. Remand Results at 13–14. SolarWorld does not present any new evidence or argument to support the inclusion of the Comtrade data. The court holds that reliance on just the IHS data in this instance is supported by substantial evidence given its specificity to the product at issue and sustains Commerce's determination.

### IV. Specificity of Electricity

In its original determination, Commerce found that the provision of electricity was a specific subsidy after applying an adverse inference to the facts available ("AFA") on the record. I & D Memo at 33–34. As with other issues noted above, the government asked for a remand to reconsider its determination that the provision of electricity is a specific subsidy in view of Changzhou Trina I and Changzhou Trina II. See Canadian Solar I, at *2.

On remand, Commerce asserts that the provision of electricity is regionally specific under 19 U.S.C. § 1677(5A)(D)(iv). Remand Results at 14–19. Commerce found that there is price variation across provinces and that the GOC failed to fully account for apparent price adjustments made by the government. Id. at 14–16. Commerce faulted the GOC for not providing the provincial price proposals submitted to the NDRC, a central government agency, or otherwise provide a full explanation to account for the variations. Id. Accordingly, Commerce claims it cannot determine whether the prices are set in accordance with market principles. Id. Although the GOC claims that, as of April 2015, the NDRC delegated price setting authority to the provinces, Commerce put

information on the record that it claims undermines this claim. Id. at 16–19. Commerce applied adverse inferences to the facts available and determined that electricity is a regionally specific subsidy given the unaccounted-for price discrepancies among provinces and involvement of the NDRC in adjusting prices. Id. at 19.

Canadian Solar argues that Commerce is improperly using AFA in rendering its remand determination. Canadian Solar Br. at 11–14. It argues that the record demonstrates that the NDRC is no longer involved in setting the price of electricity and that Commerce misunderstands the NDRC Notices 2909 and 748 it relies on in making its decision. Id. at 13–15. Further, Canadian Solar argues that Commerce does not comply with the court's order by failing to show that any particular region is receiving preferential subsidized rates. Id. at 15–20. It contends that even if the application of AFA was appropriate, Commerce was required to find that a specific province was receiving the subsidy as Commerce's determination effectively finds all provinces subsidized. Id. at 21–25.

The government responds that the GOC's non-cooperation prevented Commerce from making a precise determination regarding provincial price variation. Gov. Reply at 20. It further contends that Commerce's determination that the GOC's central government is still involved in price setting is a reasonable reading of the record, especially in view of the NDRC Notices. Id. at 21–23.

Commerce's determination prior to April 2015 rests on a nearly identical record to the one at issue in Changzhou Trina III. There, the court held that Commerce reasonably determined that the central government (via the NDRC) was subsidizing electricity rates in the PRC. See Changzhou Trina III, at *11–12. After making that determination, Commerce attempted to ascertain the reason for price variation among the provinces, but the GOC refused to provide

adequate information to determine the reason for the variations. Id. Accordingly, Commerce applied an adverse inference and determined that the provision of electricity was a regional subsidy. Id. The court sustained Commerce's decision, holding that the use of an adverse inference under those circumstances and the determination of regional specificity was reasonable. Id. at *12. Similarly here, the GOC failed to account for the regional differences such that Commerce is unable to determine whether the price variations were due to impermissible regional subsidization. See Remand Results at 15–16. Thus, for the reasons stated in Changzhou Trina III, the court finds that prior to April 2015, Commerce's determination of regional specificity is sustained.

      The question becomes whether changes in April 2015 render Commerce's finding unreasonable after that date. Canadian Solar points to Notice 748 and argues that it undermines Commerce's determination that the NDRC is involved in setting prices after April 2015. Canadian Solar Br. at 14-15. Notice 2909 from 2004 states that the NDRC has the authority to "adopt price intervention measures," to avoid sharp electricity fluctuation. See Additional Documents Memorandum, Ex. SQR-1, P.R. 198-199 (Dep't Commerce Jan. 2, 2018) ("Notice 2909"). Canadian Solar maintains that Notice 2909 was superseded by Notice 748 from 2015, which it claims shows that the NDRC is no longer involved in price setting. Canadian Solar Br. at 13–15. Commerce concluded that Notice 2909 is still relevant, and regardless, language in Notice 748 indicates that provincial governments still submit their price proposals to the NDRC. Remand Results at 17–19. This court has previously sustained Commerce's determination made in view of Notice 748 in Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States, 405 F. Supp. 3d 1317, 1138 (CIT 2019). Here too, the court sustains Commerce's determination as Notice 748 supports Commerce's determination that the NDRC is still involved in price setting in some capacity as Article 6 directs provinces to report their plans to the NDRC. See GOC Initial CVD

Questionnaire Resp., Ex. II E.22, P.R. 98-101 (Aug. 28, 2017) ("Notice 748"). Although Canadian Solar contends that such submission are "not strictly mandatory," Canadian Solar Br. at 15, that does not render Commerce's determination unreasonable. Accordingly, the court sustains Commerce's determination regarding the countervailable subsidization of electricity in the PRC.

## V. Polysilicon Benchmark

In the underlying review, Canadian Solar submitted its purchase data of imported polysilicon for Commerce to use in computing a benchmark. See Canadian Solar I, at *2. Commerce determined, however, that the GOC's participation in the market would skew import data such that it was unusable as a tier-one metric. Id.; see also 19 C.F.R. § 351.511(a)(2)(i). The court remanded for Commerce to explain how the GOC's involvement in "the general polysilicon industry led to the price distortion of imported solar-grade polysilicon," or otherwise use Canadian Solar's import data as a tier-one metric. See Canadian Solar I, at *3.

On remand, Commerce has "undertak[en] a broader analysis of the solar grade polysilicon market," and determined that, in addition to the GOC's participation in the polysilicon market, other factors have led to a distorted polysilicon market in the PRC. See Remand Results at 21–29. Commerce has supplemented the record and now cites the GOC's 12th Five Year Plan for the Solar Photovoltaic Industry and the 2013 annual report of GCL-Poly Energy Holdings Limited, a large Chinese solar-grade polysilicon producer, as evidence that the solar-grade polysilicon market is distorted such that import data is unusable. Id. at 21. Commerce additionally explained the relevance of previously submitted record documents. Id. at 23–24. Taken together, Commerce finds that the government's minority ownership, 15 percent export duties on polysilicon, government agreements with foreign polysilicon manufacturers, and government support for the domestic solar and polysilicon industries distort the domestic solar-grade polysilicon market. Id.

at 25–29. Thus, Commerce continues to conclude that the domestic market is distorted and that this distortion extends to imported polysilicon as the prices are depressed due to the less expensive domestic supply. Id. at 24–27.

Canadian Solar asserts that Commerce has not demonstrated that the GOC's ownership interest in the polysilicon market is significant enough to distort prices. Canadian Br. at 26–27. It further contends that the information relied on by Commerce is outdated and that data it submitted "shows a decrease in the Chinese domestic market price of polysilicon due to the lower priced imports of polysilicon in 2015." Id. at 27–28. Although Canadian Solar acknowledges that this record is "nearly identical" to the record in Changzhou Trina III, in which the court upheld Commerce's decision to resort to a tier-two price for polysilicon, it contends that the court should conclude that Commerce's decision here was unsupported by substantial evidence. Id. at 28-29.

The government responds that Commerce's decision should be sustained based on the newly submitted evidence and more-detailed explanation of its reasoning. Gov. Br. at 14–18. It argues that Canadian Solar's argument that the information relied upon is outdated is unavailing because Commerce found that the record did not demonstrate that the relevant conditions had changed. Id. at 17. It also contends that Commerce explained that the evidence does not demonstrate that import prices drove down the cost of domestic polysilicon, rather than the opposite. Id.

As the court explained in Changzhou Trina III, Commerce is not required to show that the GOC owns or has a management interest in a substantial amount of the polysilicon market to properly make a market distortion finding as other types of interference can have similar price distorting effects. See Changzhou Trina III, at *8. Commerce has added new information to the record that supports its contention that the GOC is involved in the solar-grade polysilicon industry.

Case 1:18-cv-00187-JAR   Document 25   Filed 10/19/20   Page 15 of 16

Consol. Court No. 18-00184 Page 15

See <u>Reopening the Record and Opportunity to Comment</u>, Rem. P.R. 1 (Dep't Commerce Apr. 1, 2020). This new information, paired with Commerce's more detailed explanation of previous submissions, support Commerce's determination that various GOC policies together depress the domestic price of solar-grade polysilicon, including imports. See <u>Changzhou Trina III</u>, at *8–9 (finding, based on a similar record, that WTO-inconsistent export duties and the GOC's various market interventions distorted polysilicon prices). Canadian Solar's conclusory argument regarding Commerce's use of supposedly outdated information is unavailing. Contrary to Canadian Solar's argument, Commerce's understanding that domestic prices depressed imports rather than the other way around is a reasonable reading of the evidence. <u>Id.</u> at *9 (citation omitted) (noting that the court would not substitute its judgment for an agency's reasonable interpretation of the evidence). Commerce's determination that the solar-grade polysilicon market was distorted such that it could not use Canadian Solar's import data as a tier-one metric is supported by substantial evidence and is accordingly sustained.

## VI. Xeneta Data

In its preliminary determination Commerce computed the ocean freight benchmark by averaging two datasets from Xeneta and Maersk. See <u>Canadian Solar I</u>, at *3. After determining that it was unclear whether the Xeneta data included destination terminal handling charges, Commerce used only the Maersk data in its final determination. <u>Id.</u> The court remanded for Commerce to reconsider its decision as it appeared that the Xeneta dataset submitted by Canadian Solar included the terminal handling charges. <u>Id.</u> at *3–4.

On remand, Commerce reviewed the evidence and determined that the Canadian Solar data did include the terminal handling charges and reverted to averaging the two in setting the ocean freight benchmark. See <u>Remand Results</u> at 29–30. No party challenges Commerce's remand

decision to average the two datasets. Commerce has complied with the court's remand instructions, and there being no dispute, the court sustains Commerce's determination on remand.

## VII.    Translation Error

After Commerce issued its preliminary results, Canadian Solar realized it had inadvertently mistranslated one of the electricity schedules it had submitted and alerted Commerce of its mistake. See Canadian Solar I, at *4. Faulting Canadian Solar for failing to submit accurate information, Commerce declined to assess whether the schedules had been mistranslated, despite having evidence on record that Canadian Solar claimed made the error clear. Id. The court determined that in this situation, where Commerce was made aware of an error shortly after issuing the preliminary results and the error was purportedly clear from record evidence, Commerce had to consider whether there was an error in the translation. Id. at *5.

On remand, Commerce compared the translation of "relevant Chinese characters to the GOC's translation of the same characters in a related document," and determined that Canadian Solar had mistranslated a column heading in one of its worksheets. See Remand Results at 30-31. Accordingly, Commerce corrected the translation and revised the calculations. Id. at 31. No party opposes Commerce's correction and accordingly the court sustains Commerce's decision to make the alteration.

## CONCLUSION

For the above-mentioned reasons, Commerce's Remand Results are **SUSTAINED**.

/s/ Jane A. Restani
Jane A. Restani, Judge

Dated: October 19, 2020
      New York, New York